|                                    |   |                              |
|------------------------------------|---|------------------------------|
| UNITED STATES DISTRICT COURT       |   | EASTERN DISTRICT OF TEXAS    |

CHRISTOPHER J. MOSER, *Trustee*, §
and KERNELL THAW, §
§
       Appellants, §
§
*versus* §    CIVIL ACTION NO. 4:17-CV-104
§
FIDELITY NATIONAL TITLE §
INSURANCE COMPANY, §
§
       Appellee. §

## MEMORANDUM AND ORDER

Pending before the court is Christopher Moser ("Moser" or "the Trustee") and Kernell Thaw's ("Kernell") (collectively, "Appellants") appeal from the judgment of the United States Bankruptcy Court, entered February 6, 2017, wherein the Honorable Brenda T. Rhoades found that an exclusion and the fortuity doctrine barred coverage under a title insurance policy issued by Fidelity National Title Insurance Company ("Fidelity"). Having reviewed the bankruptcy judge's opinion and order, the record, the submissions of the parties, and the applicable law, the court is of the opinion that the bankruptcy court's decision should be affirmed.

I.    <u>Background</u>

Kernell and Stanley Thaw ("Stanley") (collectively, "the Thaws") were married in 2001. The following year, Stanley and Dr. Leslie Schachar ("Schachar") began operating a business together. When the business failed, Schachar paid business debts that were guaranteed by both Stanley and Schachar and, on May 6, 2008, sued to recover Stanley's share of the debt. While the action was pending in a state district court, the Thaws made arrangements to purchase a home located at 5197 Brandywine Lane in Frisco, Texas ("the Brandywine Property"). On August 6,

2009, the state district court granted a motion for partial summary judgment for Schachar in the amount of $349,535.82, plus $12,500.00 in attorney's fees, and postjudgment interest at the rate of five percent. On October 28, 2009, the Thaws executed a contract to purchase the Brandywine Property with Axxium Custom Homes Dallas, LLC ("Axxium"), for a principal amount of $1,750,000.00. On November 1, 2009, the Thaws revised the contract for deed, increasing the principal amount to $2,150,000.000.[1] The Thaws did not record the contract for deed in the real property records of Collin County, Texas. On November 5, 2009, the state district court issued a final judgment against Stanley ("the Schachar Judgment"), which Stanley appealed. On November 11, 2009, Schachar recorded an abstract of judgment in the real property records of Collin County, Texas, before the Thaws moved into the Brandywine Property in January 2010.

While Stanley's appeal was pending, the Thaws sought financing to pay off the Brandywine Property and, through their businesses, borrowed money to pay off the Brandywine Property at an accelerated rate.[2] The businesses, many of which were established during the pendency of

---

[1] At trial, Kernell testified that she did not recall whether or why the contract for deed was revised. In a document dated July 13, 2011, the Thaws acknowledged that the fair market value of the Brandywine Property was $1,790,000.00.

[2] During a prior adversary proceeding, the bankruptcy court found that the Thaws made payments towards the Brandywine Property through HBO2 Works, LLC, and its spinoff companies, HBO2Works Houston, LLC, HBO2 America, LLC, and HBO2Works San Antonio, LLC (collectively, "the HBO2 companies"). *In re Thaw*, 496 B.R. 842, 845-46 (Bankr. E.D. Tex. 2013), *aff'd sub nom. Thaw v. Moser*, No. 4:13-CV-276, 2014 WL 186062 (E.D. Tex. Jan. 16, 2014), *aff'd on other grounds sub nom. In re Thaw*, 769 F.3d 366 (5th Cir. 2014). The Thaws' payments between November 1, 2009, and June 27, 2011, amounting to a total of $1,089,888.02, were primarily financed through borrowing. *Id.* Of this amount, the Thaws personally paid only about $191,400.00. *Id.* On June 27, 2011, the Thaws completed the purchase of the Brandywine Property with a letter of credit from Axxium in the amount of $1,133,195.70, and a mortgage loan from Regions Bank in the amount of $1,000,000.00.

Schachar's lawsuit against Stanley, were purportedly owned by Kernell.[3] Around June 27, 2011, the Thaws paid off the contract for deed, obtained a special warranty deed for the Brandywine Property from Axxium, and recorded the deed in the property records of Collin County, Texas. On June 28, 2011, Fidelity issued a title insurance policy ("the Policy"). On July 26, 2011, a Texas court of appeals affirmed the Schachar Judgment, and on November 4, 2011, the Supreme Court of Texas denied Stanley's petition for review. *See Thaw v. Schachar*, No. 07-10-0027-CV, 2011 WL 3112064 (Tex. App.—Amarillo July 26, 2011, pet. denied).

On December 2, 2011, Stanley filed a petition for relief under Chapter 7 of the Bankruptcy Code. Subsequently, Moser was appointed as Trustee of Stanley's bankruptcy estate, and Schachar filed a proof of claim, asserting he had a secured claim of $400,566.17 on the petition date. During the course of the bankruptcy proceedings, this court held, and was ultimately affirmed by the Fifth Circuit, that a judgment lien ("the Schachar Lien") attached to the Brandywine Property on November 11, 2009, when Schachar filed his abstract of judgment and before the Thaws made the Brandywine Property their homestead. *Moser v. Schachar*, 4:14-CV-185, 2015 WL 679689 (E.D. Tex. Feb. 17, 2015), *aff'd sub nom. In re Thaw*, 620 F. App'x 304 (5th Cir. 2015). Thus, when the Brandywine Property was sold in September 2013, the Schachar Lien attached to the net proceeds of the sale, approximately $500,000.00.

The Policy is "a contract of indemnity, meaning a promise to pay [the insured] or take other action if [the insured] ha[s] a loss resulting from a covered title risk." In the section entitled

---

[3] Kernell claimed ownership of the HBO2 companies, testifying at trial that she used proceeds in the amount of about $25,000.00 from the sale of her pre-marital residence to form HBO2 Works, LLC, around June 2004. *In re Thaw*, 496 B.R. at 845. The bankruptcy court found, based on the Thaws' tax returns, that the HBO2 companies were financed through borrowing rather than Kernell's separate property. *Id*.

"Covered Title Risks," the Policy includes, "a lien on your title because of . . . a judgment." In the section entitled "Exclusions," the Policy states that it excludes title risks "that are created, allowed, or agreed to by you" ("Exclusion 3(a)"). "You" or "your" refer to the insured.

On January 28, 2014, the Trustee made a demand on Fidelity for benefits under the Policy, which Fidelity denied on March 19, 2014. Kernell similarly made a demand on February 21, 2014, which was denied on March 26, 2014. On January 20, 2016, the bankruptcy court approved a settlement in which Schachar received about $444,000.00 from the net proceeds of the sale in full satisfaction of his claim. Appellants subsequently sued Fidelity in an adversary proceeding, arguing that Fidelity breached the Policy by denying the claim. The bankruptcy court issued an order holding: (1) the Trustee had standing to assert a claim for benefits under the Policy; (2) the Trustee and Kernell did not lose benefits under the Policy when the Brandywine Property was sold; and (3) coverage under the Policy was barred because Exclusion 3(a) and the fortuity doctrine applied. It is from this order that the Trustee and Kernell appeal.

II. Analysis

    A. Jurisdiction

District courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" and, with leave of the court, "other interlocutory orders and decrees" of bankruptcy judges. 28 U.S.C. § 158(a). Appeal from the bankruptcy court to the district court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts." *Id.* § 158(c)(2). Therefore, "when reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court." *First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.)*, 713 F.3d

285, 293 (5th Cir. 2013) (quoting *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir. 1992)); *accord Perry v. Dearing (In re Perry)*, 345 F.3d 303, 308-09 (5th Cir. 2003).

B.     Standard of Review

In reviewing a decision of the bankruptcy court, the court must accept the bankruptcy court's findings of fact unless clearly erroneous and examine the bankruptcy court's conclusions of law *de novo*. *See In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 293-94; *In re Halo Wireless, Inc.*, 684 F.3d 581, 586 (5th Cir. 2012); *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 346 (5th Cir. 2008). Mixed questions of law and fact are reviewed *de novo*. *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 294; *Tech. Lending Partners, LLC v. San Patricio Cty. Cmty. Action Agency (In re San Patricio Cty. Cmty. Action Agency)*, 575 F.3d 553, 557 (5th Cir. 2009). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. *See In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 293-94 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)); *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258-59 (5th Cir. 2006).

Under Texas law, the interpretation of insurance policies is governed by the same rules that apply to the interpretation of other contracts. *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 858 (5th Cir. 2014); *Pendergest-Holt v. Certain Underwriters at Lloyd's*, 600 F.3d 562, 569 (5th Cir. 2010); *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 892-93 (Tex. 2017); *Nat'l Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008). The determination of whether an insurance policy is ambiguous is a question of law for the court to decide. *Doubletree*

5

*Partners, L.P.*, 739 F.3d at 858; *Carrizales v. State Farm Lloyds*, 518 F.3d 343, 346 (5th Cir. 2008). Ambiguity does not result simply because the parties differ in their interpretations of the policy. *United Nat'l Ins. Co. v. Mundell Terminal Servs., Inc.*, 740 F.3d 1022, 1027 (5th Cir. 2014); *Doubletree Partners, L.P.*, 739 F.3d at 859; *Tex. Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2007); *Primo*, 512 S.W.3d at 893. Rather, "[a]n ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Doubletree Partners, L.P.*, 739 F.3d at 858-59 (quoting *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)); *accord Tex. Indus., Inc.*, 486 F.3d at 846; *Primo*, 512 S.W.3d at 893. If an insurance policy is ambiguous and is susceptible to more than one reasonable interpretation, under the "contra-insurer rule," it will be construed in favor of the insured. *Doubletree Partners, L.P.*, 739 F.3d at 859 & n.28; *Carrizales*, 518 F.3d at 346; *Tex. Indus., Inc.*, 486 F.3d at 846; *Hulcher Servs., Inc. v. Great Am. Ins. Co.*, No. 4:14-CV-231, 2015 WL 3921903, at *4 (E.D. Tex. June 25, 2015); *State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998). This rule of construction does not apply, however, when the insurance contract is expressed in plain and unambiguous language and is susceptible to only one reasonable interpretation. *See Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 369 (5th Cir. 1998); *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 99 F.3d 695, 701 (5th Cir. 1996); *Armijo v. Tetra Techs., Inc.*, 936 F. Supp. 2d 675, 686 (E.D. La. 2013).

Under Texas law, the insured has the initial burden of establishing coverage under the terms of the policy. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010); *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008). The insurer, however, bears the burden of establishing that one of the policy's limitations or

exclusions constitutes an avoidance or affirmative defense to coverage. TEX. INS. CODE ANN. § 554.002; *see Doubletree Partners, L.P.*, 739 F.3d at 859; *United Nat'l Ins. Co. v. Hydro Tank, Inc.*, 497 F.3d 445, 448 (5th Cir. 2007); *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 854 (5th Cir. 2003); *Harken Expl. Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001). Once the insurer demonstrates that an exclusion arguably applies, the burden then shifts back to the insured to show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion. *Century Sur. Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir. 2009); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 553 (5th Cir. 2004); *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 124; *Pinnacle Anesthesia Consultants, P.A. v. St. Paul Mercury Ins. Co.*, 359 S.W.3d 389, 392 (Tex. App.—Dallas 2012, pet. denied).

    C.    <u>Arguments in Support of Appeal</u>

Appellants appeal the bankruptcy court's order on two grounds: (1) the Thaws did not have the requisite intent and therefore could not have "created, allowed, or agreed to" the Schachar lien, and (2) the fortuity doctrine does not apply. Appellants argue that the bankruptcy court clearly erred in finding that the Thaws were served with notice of the recordation of the Schachar Lien and no other evidence indicated they had actual knowledge of the Schachar Lien before the Policy was issued. Appellants deny that the Thaws engaged in any wrongdoing by attempting to convert non-exempt assets into an exempt homestead. In addition, Kernell denies liability for Stanley's obligation to Schachar and maintains that the bankruptcy court clearly erred in finding she was aware of the Schachar Judgment.

7

1. Exclusion 3(a) – "Created, Allowed, or Agreed to"

Exclusion 3(a) of the Policy states, "We do not cover title risks . . . that are created, allowed, or agreed to by you." This language is standard in most title insurance policies and has been interpreted to exclude coverage when an insured purchased property with prior actual knowledge of the title defect. *See, e.g.*, *First Am. Title Ins. Co. v. Lane Powell PC*, 764 F.3d 114, 121 (1st Cir. 2014) (excluding coverage after foreclosure because insured knowingly assumed junior mortgages); *Marr v. Commonwealth Land Title Ins. Co.*, No. 3:06-CV-20-S, 2009 WL 5125624, at *6 (W.D. Ky. Dec. 21, 2009) (excluding coverage because insured purchased property after receiving document from insurer listing recorded liens on the property). Courts have also interpreted the exclusion to bar coverage when an insured's intentional misconduct gave rise to the title defect after the title insurance policy was issued. *See, e.g.*, *BB Syndication Servs., Inc. v. First Am. Title Ins. Co.*, 780 F.3d 825, 835-36 (7th Cir. 2015) (finding insured "created" liens that arose from insufficient funds by continuing to fund doomed construction project and failing to investigate or control cost overruns); *Brown v. St. Paul Title Ins. Co.*, 634 F.2d 1103, 1110 (8th Cir. 1980) (finding insured with first mortgage lien "created or suffered" mechanic's liens after borrower defaulted by refusing to lend funds to pay for work already completed); *Bankers Tr. Co. v. Transamerica Title Ins. Co.*, 594 F.2d 231, 234 (10th Cir. 1979) (finding insured "created or suffered" mechanic's liens by refusing to lend up to the amount of its loan commitment to pay for work already completed).

The Fifth Circuit recently stated:[4]

> In interpreting exclusion 3(a), which is a standard exclusion in policies across the country, courts agree that "suffered" is synonymous with the word "permit" and implies the power to prohibit or prevent the lien which has not been exercised although the insured has full knowledge of what is to be done with the intention that it be done. The term "assume" in exclusion 3(a) requires knowledge of the specific title defect assumed. Courts have held that the insured party does not assume an assessment against property merely because he agreed to take the property "subject to" any assessments. The last of the three terms at issue here—"agreed to"—carries connotations of "contracted," requiring full knowledge by the insured of the extent and amount of the claim against the insured's title. All of the terms require some degree of intent to acquire the property with defects in its title.

*Doubletree Partners, L.P.*, 739 F.3d at 867 (footnotes omitted) (interpreting "suffered, assumed, or agreed to" in exclusion 3(a) of analogous form, Texas Form T-1: Owner's Policy of Title Insurance).

In *Doubletree Partners, L.P.*, the insured purchased property for development knowing it was subject to a flowage easement. 739 F.3d at 853. Before closing and purchasing a title insurance policy, the insured obtained a survey that did not reveal the magnitude of the flowage easement. *Id.* at 854. After discovering the full extent of the flowage easement, the insured was unable to develop the property as planned and the property was subject to foreclosure. *Id.* at 855. The title insurer denied coverage, claiming that the insured "suffered, assumed, or agreed to" the flowage easement as a title defect by purchasing the property "subject to" the flowage easement as stated on the sales contract, the deed, the final title commitment, and a leaseback agreement. *Id.* at 866. The court rejected the title insurer's interpretation, which nullified policy language

---

[4] The policy in *Doubletree Partners, L.P.*, was a Form T-1: Owner's Policy of Title Insurance. The Policy issued to the Thaws by Fidelity was a Form T-1R: Texas Residential Owner's Policy of Title Insurance. The policy in *Doubletree Partners, L.P.*, excluded defects "created, suffered, assumed[,] or agreed to by the insured claimant"; however, the Fifth Circuit did not interpret "created." *See Doubletree Partners, L.P.*, 739 F.3d at 867.

excluding from coverage the "[f]lowage easement . . . and shown on survey," and adopted the insured's reasonable interpretation that "suffered, assumed, or agreed to" required knowledge of both the existence and extent of the easement. *Id.* at 867-68. Based on references to the survey in the documents, the court held that coverage was not excluded because the insured "suffered, assumed, or agreed to" the flowage easement only as shown on the the survey. *Id*.

Appellants contend that Exclusion 3(a) does not apply because the Thaws did not have "full knowledge" that the Schachar Lien had attached to the Brandywine Property when Fidelity issued the Policy on June 28, 2011. *See id.* at 868 ("suffer," "assume," and "agree to" are terms that "require some degree of intent by the insured to acquire the property with the defect in its title." (citing *Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir. 1986))). Appellants point out that the two subpoenas served on Kernell on August 1, 2011, were the Thaws' only potential source of notice of the Schachar Lien in the record. Neither of these subpoenas indicated the existence of a judgment or lien. According to Appellants, the Thaws only became aware of the Schachar Lien around September 2013, when Schachar said he believed his judgment lien had attached to the Brandywine Property. In response, Fidelity avers that the Thaws knew that Stanley owed a debt to Schachar and that Schachar had obtained a judgment while they were purchasing the Brandywine Property; therefore, the Thaws had the requisite knowledge to create, allow, or agree to the Schachar Lien.[5]

---

[5] Fidelity also contends that the Schachar Lien was not covered under the policy because it did not attach until after the Thaws obtained title to the Brandywine Property around June 27, 2011. The court does not address this argument because it already held, as affirmed by the Fifth Circuit, that the Schachar Lien attached on November 11, 2009. *See Moser*, 2015 WL 679689, at *10.

Citing *Doubletree Partners, L.P.*, Appellants interpret "created, allowed, or agreed to" in the Policy to require proof that the Thaws had full and specific knowledge of the Schachar Lien. Citation to *Doubletree Partners, L.P.*, however, is misplaced because the court interpreted "suffered, assumed, or agreed to," and the language at issue here is "created, allowed, or agreed to." *See* 739 F.3d at 867. In addition, it would be unreasonable for insureds to engage in a scheme to avoid paying a debt if they had "full knowledge" that the scheme would fail. Under Appellants' reading of Exclusion 3(a), an insured who engages in substantial misconduct would be entitled to insurance benefits whenever an insurer cannot prove the insured acted with full and specific knowledge that the insured's conduct would result in liability, including circumstances of willful ignorance. This interpretation would essentially make a title insurer the guarantor of an insured's debt where, as here, an insured who intentionally refuses to fulfill the insured's financial obligations later denies knowing that a lien would arise as a consequence. *See Brown,* 634 F.2d at 1110; *Bankers Tr. Co.*, 594 F.2d at 234. As a result, the court declines to adopt Appellants' interpretation of the Policy because it is not reasonable. *See Bailey*, 133 F.3d at 369 ("[T]his court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable" (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987)); *Canutillo Indep. Sch. Dist.*, 99 F.3d at 701 ("[S]pecial rules favoring the insured . . . are applicable only when there is an ambiguity in the policy [and not] if the exclusions in questions are susceptible to only one reasonable construction").

While Fidelity did not establish the Thaws were served notice of recordation of the judgment lien, courts interpreting Exclusion 3(a) have not required an insured to have actual and specific knowledge of the title defect. In *Doubletree Partners, L.P.*, the court stated:

11

> [T]he insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved.

739 F.3d at 866 (quoting *Brown*, 634 F.2d at 1107-08 n.8). The court held the exclusion did not apply only after determining that the title defect at issue was an undisclosed preexisting condition and the insured's actions did not give rise to the title defect. *See id.* ("The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss." (quoting *Brown*, 634 F.3d at 1107-08 n.8)).

Unlike the insured in *Doubletree Partners*, *L.P.*, who purchased property relying on a survey that did not disclose the full magnitude of the flowage easement, the Thaws were not innocent or simply negligent parties. There was nothing undisclosed about Stanley's obligations to Schachar, and Stanley's conduct gave rise to the debt collection action that resulted in the Schachar Judgment. The Thaws knew that Schachar had filed suit against Stanley and obtained a partial judgment because Stanley refused to pay the debt owed to Schachar arising from Schachar's payment of Stanley's share of their prior business debts, and the Thaws executed the contract for deed with Axxium to purchase the Brandywine Property when a final judgment was imminent. Based on the standards recited in *Doubletree Partners, L.P.*, Fidelity was not required to prove that the Thaws knew of the existence or magnitude of the Schachar Lien when they purchased the Brandywine Property. Instead, the applicability of Exclusion 3(a) turns on whether the Thaws "created, allowed or agreed to" the Schachar Lien as a result of their "intentional misconduct or inequitable dealings." *Doubletree Partners, L.P.*, 739 F.3d at 866.

Fidelity argues that coverage should be excluded for title defects that arise when an insured chooses not to pay debts over which the insured has responsibility and control. Otherwise, the

insurer becomes a guarantor of the insured's debts. "As a number of federal courts have recognized, the 'created or suffered' language is intended to protect the insurer from liability for matters caused by the insured's own intentional misconduct, breach of duty, or otherwise inequitable dealings." *Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 732 (7th Cir. 2012) (collecting cases); *see First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 187 P.3d 1107, 1113 (Ariz. 2008) ("Title insurance principally protects against unknown and unknowable risks caused by third-party conduct, not intentional acts of the policyholder.").

Some courts have applied Exclusion 3(a) when the insured intended to create a title defect, such as when the insured created the lien for which it later sought title insurance benefits. *See, e.g.*, *Transamerica Title Ins. Co. v. Alaska Fed. Sav. & Loan Ass'n*, 833 F.2d 775, 776 (9th Cir. 1987) (holding title insurer had no duty to defend insured-lender in title dispute involving property in which insured-lender intentionally obtained a security interest, thus "creating" the title defect for which the insured-lender sought coverage). Other courts have applied Exclusion 3(a), even in the absence of misconduct, when the insured merely intended the act that gave rise to the title defect. *See, e.g.*, *Action Acquisitions, LLC*, 187 P.3d at 1113 (concluding the exclusion applied "whenever the insured intended the act causing the defect, not only when the insured intended the defect or when the insured engaged in misconduct"). Most courts have recognized the exclusion applies when the insured intended the misconduct that gave rise to the title defect and the insured would receive an inequitable windfall at the expense of the insurer. *See Ticor Title Ins. Co.*, 695 F.3d at 733 ("[T]he clear majority view among courts of other jurisdictions is that the exclusion applies only to intentional misconduct, breach of duty, or otherwise inequitable dealings by the insured."); *Am. Sav. & Loan Ass'n*, 793 F.2d at 784 ("To the extent that an insured has breached

an obligation or would derive a windfall profit from recovery against its insurer, courts are more inclined to find that the insured created, suffered, assumed or agreed to the defect, lien or encumbrance.").

Appellants deny that intentional misconduct directly created the loss. They maintain that Stanley's only intentional affirmative act was signing the joint and several guarantees with Schachar when they went into business together, arguing that signing the guarantees did not directly create the Schachar Lien. Similar to actual and specific knowledge, an intentional affirmative act is not required to trigger Exclusion 3(a). Courts have upheld Exclusion 3(a) when liens arose as a result of an insured's decision not to pay financial obligations pursuant to a contractual agreement. *See BB Syndication Servs., Inc.*, 780 F.3d at 835; *Brown,* 634 F.2d at 1110; *Bankers Tr. Co.*, 594 F.2d at 234. Appellants' assertion that the Schachar Lien was not caused by intentional and premeditated manipulation is not supported by the record. Based on the record and the evidence presented at trial, the bankruptcy court found:

> When they obtained the Policy, the Thaws knew Schachar had honored Stanley['s] guarantees to Theramedics' creditors, they knew Schachar had sued Stanley . . . to collect his proportionate share of the guaranteed indebtedness, they knew Schachar had obtained a judgment against Stanley . . . and they knew Schachar was seeking to collect the judgment from Stanley . . . .

Even though the Thaws had the financial resources to pay the debt and knew that Schachar had obtained a judgment, they attempted to avoid paying the debt by investing their non-exempt assets into ostensibly exempt property while the Schachar Judgment was pending appeal. The court agrees with the bankruptcy court's conclusion that the Schachar Lien arose because of Stanley's intentional refusal to honor his financial obligations as a guarantor.

Appellants also deny inequitable dealings, citing Texas law that permits a debtor's conversion of non-exempt assets into an exempt homestead. *See In re Coates*, 242 B.R. 901, 906-07 (Bankr. N.D. Tex. 2000); *Bell v. Beazley*, 18 Tex. Civ. App. 639, 403, 45 S.W. 401, 403 (1898). It was judicially determined that the Brandywine Property did not have homestead protection when the Schachar Lien attached. *See Moser*, 2015 WL 679689, at *10. Therefore, Appellants cannot characterize the Thaws' conduct as permissible investment in an exempt homestead. Accordingly, the bankruptcy court did not err when it concluded that coverage was excluded because the Thaws "created, allowed, or agreed to" the Schachar Lien.

Kernell asserts separate contractual rights from Stanley, contending that Stanley's failure to honor his obligations as a guarantor does not affect her contractual rights under the Policy. Under Texas law, "the illegal destruction of jointly owned property by one co-insured shall not bar recovery under an insurance policy by an innocent co-insured." *Kulubis v. Tex. Farm Bureau Underwriters Ins. Co.*, 706 S.W.2d 953, 955 (Tex. 1986); *see Weidner v. Nationwide Prop. & Cas. Ins. Co.*, 74 F. Supp. 3d 814, 820 (E.D. Tex. 2014). The bankruptcy court found that Kernell was a full participant in the Thaws' scheme to avoid paying creditors. Kernell previously testified that she was the owner and operator of the HBO2 companies. *In re Thaw*, 496 B.R. at 845. While Schachar's lawsuit against Stanley was pending in state court in 2008 and 2009, the Thaws established HBO2Works Houston, LLC, HBO2 America, LLC, and HBO2Works San Antonio, LLC. *Id*. Then, while the appeal was pending, the Thaws borrowed money through the HBO2 companies to make accelerated payments on the Brandywine Property and entered into additional transactions with Axxium as part of their scheme to avoid paying the Schachar Judgment. *Id*. at 846-47. In this proceeding, Kernell downplayed her role at the HBO2

15

companies, testifying that she merely took care of HR, benefits, and marketing for the HBO2 companies. *See* Doc. No. 10, at 207. Despite Kernell's claims that she did not engage in any misconduct, the record does not leave the court "with the definite and firm conviction" that the bankruptcy court made a mistake. *See In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 293 ("findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses"). "A trial court is uniquely situated to make the determination of the co-insured's innocence, and, unless there is a finding of lack of innocence, the co-insured shall be permitted to recover." *See Kulubis*, 706 S.W.2d at 955. Here, the bankruptcy court found Kernell to be far from innocent. As a result, Kernell may not recover as an innocent co-insured against Fidelity for the loss of community property.

### 2. The Fortuity Doctrine

"The fortuity doctrine relieves insurers from covering certain behaviors that the insured undertook prior to purchasing the policy." *RLI Ins. Co. v. Maxxon Sw. Inc.*, 108 F. App'x 194, 198 (5th Cir. 2004). "Under the fortuity doctrine, an insured cannot obtain coverage for something that has already begun and which is known (or should have been known) to have begun." *Colony Ins. Co. v. Custom Ag Commodities, LLC*, 272 F. Supp. 3d 948, 961 (E.D. Tex. 2017) (citing *Summers v. Harris*, 573 F.2d 869, 872 (5th Cir. 1978)). The fortuity doctrine bars coverage for "known losses" and "losses in progress." *Warrantech Corp. v. Steadfast Ins. Co.*, 210 S.W.3d 760, 766 (Tex. App.—Fort Worth 2006, pet. denied); *Scottsdale Ins. Co. v. Travis*, 68 S.W.3d 72, 75 (Tex. App.—Dallas 2001, pet. denied); *Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 502 (Tex. App.—Houston [14th Dist.] 1995, no writ). A "known loss" is a loss the

insured knew had occurred before the insured entered into the contract for insurance. *Warrantech Corp.*, 210 S.W. 3d at 766 (citing *Burch v. Commonwealth Mut. Ins. Co.*, 450 S.W.2d 838, 840-41 (Tex.1970)); *Scottsdale Ins. Co.*, 68 S.W.3d at 75. A "loss in progress" is a progressive loss the insured knew or should have known was ongoing when the insured entered into the contract for insurance. *Warrantech Corp.*, 210 S.W.3d at 766; *Scottsdale Ins. Co.*, 68 S.W.3d at 75; *Two Pesos, Inc.*, 901 S.W.2d at 502.

Appellants first contend the fortuity doctrine does not preclude coverage for loss of the net proceeds from the sale of the Brandywine Property because the fortuity doctrine does not apply to "backward looking" title insurance policies. Under Texas law, however, "fortuity is a requirement of *all* insurance policies." *Warrantech Corp.*, 210 S.W.3d at 766 (citing *Two Pesos, Inc.*, 901 S.W.2d at 501). Therefore, Appellants' first argument that the fortuity doctrine does not apply must be rejected.

Appellants next assert that the fortuity doctrine does not bar coverage because the Thaws lacked actual knowledge of the Schachar Lien and would not have understood the effect of an abstract of judgment even if they had known one had been filed in the Collin County real property records. According to Kernell, Fidelity was required to prove that Kernell—independent of Stanley—knew of Schachar's abstract of judgment, knew that the abstract created a lien against the Brandywine Property, and nevertheless wrongfully attempted to shift financial liability to Fidelity. Contrary to Appellants' assertions, the fortuity doctrine does not require an insured to have specific, actual knowledge of the loss. Instead, the fortuity doctrine precludes coverage when "the insured is or *should be aware* of an ongoing progressive or known loss at the time the policy is purchased." *See RLI Ins. Co.*, 108 F. App'x at 198 (citing *Two Pesos, Inc.*, 901 S.W.2d at

17

502). "[T]he relevant inquiry is whether [the insureds] knew at the time they entered the insurance policy that they were engaging in activities for which they could possibly be found liable." *Id.* at 199 (quoting *Franklin v. Fugro-McClelland (Sw.), Inc.*, 16 F. Supp. 2d 732, 737 (S.D. Tex. 1997)).

In *RLI Insurance Co.*, the insureds argued that the fortuity doctrine did not bar coverage because they did not have the requisite knowledge that their anticompetitive behavior, four years prior to the inception of the policy, would give rise to liability. 108 F. App'x at 199. The court rejected the insureds' proposition that a "watershed event," such as the receipt of a demand or cease and desist letter or the filing of a lawsuit, must occur to make the insureds aware that the insureds crossed a line and were "engaging in conduct for which they could be held liable." *Id.* Instead, the court considered "whether the party knowingly acted in a manner in which 'it could *possibly* be found liable.'" *Id.* (emphasis added).

In *Warrantech Corp.*, the insured, an administrator of service and warranty plans, fabricated a system to avoid verifying claimant documentation of coverage and overpaid claims. 210 S.W.3d at 767. When the insured was sued as a result of the overpaid claims, the insured sought coverage from its then-current insurer. *Id.* The court applied the fortuity doctrine to bar coverage because, prior to purchasing the policy, the insured's overpayment of claims resulted in an audit, demand for reimbursement, and arbitration between the insured's former insurers. *Id.* Although the insured did not have actual knowledge of liability, the court found the insured had the requisite knowledge to trigger the fortuity doctrine. *Id.* The court stated:

> Implicit in a dishonest, fraudulent, or criminal act is knowledge that the act is wrongful. Application of the fortuity doctrine does not hinge on whether the insured knew a particular act was wrongful. Rather, it hinges on whether the

18

> insured knew before the inception of coverage that an act—knowingly wrongful or otherwise—resulted in a loss.

*Id.* at 768.

In this instance, even if the Thaws were not served notice of the recording of the abstract of judgment and would not have understood the significance of such filing, the record establishes that the Thaws had the requisite knowledge to trigger the fortuity doctrine. Stanley's refusal to pay guaranteed debts resulted in a final judgment on November 5, 2009, Schachar filed the abstract of judgment on November 11, 2009, a Texas court of appeals affirmed the judgment on July 26, 2011, and the Supreme Court of Texas denied the petition for review on November 4, 2011. When the Thaws paid off the Brandywine Property on June 27, 2011, and purchased the Policy on June 28, 2011, the Thaws' prior conduct had already given rise to potential liability and caused a known loss—the Schachar Judgment. In addition, there was a loss in progress because the nonpayment of debt continued after the Policy was issued, and Stanley did not exhaust his appeals of the Schachar Judgment until the Supreme Court of Texas denied the petition for review on November 4, 2011. For these reasons, Kernell's argument that Fidelity failed to prove that she engaged in the level of misconduct required to trigger the fortuity doctrine is unfounded.

III. Conclusion

Consistent with the foregoing analysis, the bankruptcy court did not err in finding that the Thaws had the requisite intent to create, allow, or agree to the Schachar Lien and that the fortuity doctrine barred coverage. Accordingly, the judgment of the bankruptcy court is AFFIRMED, the Trustee's request for damages for breach of contract and reasonable attorney's fees is DENIED, and the Clerk of Court is directed to close this case.

SIGNED at Beaumont, Texas, this 21st day of March, 2018.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE